Good morning everybody, and we'll call the first case Eagle Bank and Robert Van Hock vs. BR Professional Sports Group and Virginia Investment Partnership and Mr. Ciardi Good morning. My name is Albert Ciardi. I represent Robert Van Hockey, who is the appellant, the intervener, and a secured creditor in the matter below. Do you want to reserve any time for rebuttal? I would like to reserve three minutes for rebuttal. That request will be granted. The matter below in the district court was resolved on summary judgment and is before this court on the standard review of DeNovo. The reason I raise this is because there was only one issue addressed by the district court, and that was, was there actual authority for Eagle Bank to get the lien rights that it is now asserting on the asset that Mr. Van Hockey asserts equal lien rights? And that is the only issue that the court addressed, and that is the only issue then that comes up here. Well, but they had raised that issue. They raised the parent authority before the district court. The district court didn't decide it on the question of parent authority, but it was raised. It was raised, and so was ratification, and I can address that, Your Honor. But issues properly raised in the district court, if supported by the record, we can consider them here. I don't mean to disagree on that point. What I indicate is the opinion really addressed only actual authority. But the opinion also mentions other aspects of the case. The opinion of the judge mentions other aspects of the case may not have lien on them, but definitely brought them up. He did bring them up, and I could address them as well. And, in fact, we addressed them in our briefs below, that if Eagle Bank was aware that there was an actual lack of actual authority, if that did not exist, they could not then rely upon a parent authority. And based upon the factual disputes that were raised below on ratification, in that at no point in time did the members who had to approve this loan ever receive knowledge of the loan, the distribution of proceeds, and the fact that proceeds went to an insider, not as relayed only to purposes of … Well, if the loan was subject to being attacked on whatever grounds, where do you come as a third party to assert their claim, the lender, the borrower, that the loan is void or voidable or whatever it is, when you're not a party to that, you're a stranger to that loan. And we asked you for supplement of briefing, and I'm unaware that you cited any authority which gave a junior lien holder the right to avoid the senior lien by reason of a defect in the loan to the senior lien holder. Under the Uniform Commercial Code Article 9, your cause of action is a cause of action unknown to the law. Your Honor, I respectfully disagree. We cited the case of Equibank v. Adol, which is out of the Superior Court, as well as we cited the decisions on standing … But the Fox Hill and Bristol County that you cite are not junior lien holders. They're not competing lenders. They're a debtor and a limited partner. And that's classically where this arises, so that a junior lien holder, according to my research, can only challenge a superior lien if it is void. And if you lack authority, that is voidable, not void. Your Honor, in Bristol County, the decision was actually of another lien holder. It was a limited partner of the debtor, suing in derivative action on behalf of the debtor partnership. The fund deed of trust was a mortgage that existed. A deed of trust is a mortgage. That was the fund deed of trust. That was not the borrower. There were limited partners of the fund, which put a deed of trust on the property, which City Capital put a separate deed of trust on, and there was a dispute between the two deeds of trust. But it was a derivative action, was it not, brought on behalf of the partnership? Yes, it was, Your Honor. Okay. That's distinguishable. That's essential for your position here. You're not one of those parties. You're a third party. You're an officious interloper, some would say. You're asserting a right that you don't have, namely to challenge the original loan, which, as Judge Randella said, is not a void loan. If it's void, the loan was never made. Well, Your Honor, I would disagree in that we cited, as I said, the Equibank v. Abel case, which said the appellants and appellee are competing lien creditors, and the appellee is entitled to challenge the validity of the McKellen's lien in the distribution proceeding. We also cited decisions of our... Excuse me, excuse me. One of the distinctions, it could be argued, in that case, and I think that's your closest case, but one of the distinctions is that in that case they were trying to strike the mechanic's lien because of a faulty procedure taken by the mechanic's lien holder, and that was the basis of the success. Here you're trying to avoid the underlying agreement, which is, I think, another hurdle you need to get over, at least on the question of whether or not your client has standing to challenge this. And in that, Your Honor, we had cited the decisions of Kirk out of, I believe, the Intermediate Court of Appeals in Massachusetts, where they actually did challenge the validity of the underlying mortgage based on an incapacity argument, as well as the RFF decision, which, again, also that was out of the United States District Court for the District of Massachusetts, where that issue as well, where, again, it was a property owner, or it was a property owner that came in after the relationship, meaning it was a subsequent property owner that had taken the property after a sale and was now challenging a lien that was on it. The bottom line is there isn't a whole lot of law in this question. On that I completely agree. Okay, but the question I have, and it wasn't really covered here, maybe it isn't that relevant, but you intervened in this case, right? Yes. Was there any objection to your intervention? Your Honor, by the time we had filed the objection, Judge Diamond had basically granted it, I believe, before there was really any argument on that point. On that point. Yes. So Judge Diamond allowed you to intervene. Yes. And no one has challenged the propriety of that, have they? Your Honor, I would hesitate to say that it's never been challenged because I believe there were a lot of arguments regarding whether we had any right to be there, but it went more to the heart of the matter as opposed to the intervention. Procedurally, you filed a motion to be permitted to intervene. Was there any response filed that objected to it? Your Honor, I believe it was granted before they even responded. Okay. And that is why I'm – But there's not an appeal from that decision to the district court. There is not. Okay. Would you write the opinion for us if we were to rule that there was no apparent authority? How would you write that opinion? As to apparent authority or actual? Apparent. Apparent. I would actually start – Your brief is extensive as to the actual, but apparent. I would actually, Your Honor, start with the issue that once you've ruled on the actual authority and they were aware of it, as we did raise below, apparent authority is no longer then available. Because once you know that you don't have the authority to do something or get something – Once who knows? Once the bank knows that. Once the bank – The bank got a letter from a counsel, opinion of counsel, that he had the authority. The opinion of counsel, Your Honor, actually cites a nonexistent operating agreement. It might have been a bad opinion, but until you came along, no one challenged this loan. That is correct. So where do you come – what right do you have to interlope here when, as far as I can see, the Uniform Commercial Code has no such cause of action? I'm not even talking about standing. I'm talking about the absence of a cause of action recognized by the law. Your Honor, I go back to – Some of these cases you've cited involve a little nonsense or a hanky-panky between the lenders and the borrowers and so forth. But none of them are a clean case where there's a cause of action for a junior lien holder to bring about the superior lien by reason of a voidable loan, which may have been made. One of the reasons that this case really was not appropriate for summary judgment is we had obtained in the district court action and filed with our pleadings affidavits of the borrower, which disputed the validity. And it would be very difficult – One of the borrowers? One of the principals of the borrower. One of the principals, yes. You've got to get a resolution to speak for the borrower, sir. You cannot have a single member of a partnership or a corporation speak for a corporation. I agree completely, and that is the problem. Well, your problem is solved because there is no problem. Unless you have a resolution or something for the partnership, you don't have anyone objecting to the loan. Well, Your Honor, the problem with that, though, is that Eagle Bank didn't have a resolution of the members, and they were required to get one under the operating agreement. Let us assume the facts in a light most favorable to you, that this loan could have been avoided. But there's nothing here that indicates that this was a void loan, as Judge Rundell indicated, that it's an absolute loan that can't be recognized in law. It's an actual loan that was made. Monies were lent and used in the company. And that, Your Honor, may be an issue that would defeat me at trial, but it is not an issue that defeats me at summary trial. Why is it a legal issue? Because, Your Honor, there are issues that we raised as to the use of proceeds of the loan, knowledge of the members, either before and after this loan was granted, a belated attempt to get authority or a ratification of that at a later point in time. Now, you raised all that. Before you came along, no one questioned the validity of this loan. The first one that raised it was you. They got the money, and they used it for valid purposes, didn't they? Did they not? They got the money. Some of it may have been used for valid purposes. We have disputed the use of some of the other funds, and that dispute was raised below. Well, I'm assuming the facts in a light most favorable to you, that the loan could have been set aside by the borrower. But no one in the borrower ever questioned this loan, and you're not a borrower. You're a junior lien holder, and you're the first one that ever raised a question about this. That is correct, Your Honor. Let's just turn to the merits for a second. Why shouldn't we adopt the interpretation of lenders offered by Eagle Bank, namely that the term includes member banks and other traditional institutions who are lenders? What's wrong with that? That sounds like a lender to me. Well, if Your Honor looks at Section 7.5, and that is adopted. Section 7.5 was clearly set forth. May I proceed? You may. Go ahead. It was clearly set there to give protection to the members. If you read lender and you say that that is defined as anybody that borrows money, then you have completely eliminated Section 7.5a as a provision. It provides no protection to anybody. Because what is a lender but someone who offers money to somebody that wants to borrow? And if the interpretation of 7.5 is you can't borrow money without certain level of member approval, unless you're borrowing it from somebody that wants to lend money, you've, I mean, in all honesty, I would say that that's worthy of the late, great Yogi Berra, and that doesn't make any sense. And that doesn't, you can't have a phrase that you've interpreted in a document where it makes, where you read it out. The law of Virginia is clear. You've got to look at the document and interpret it as a whole. Don't you really have to go to the prior year's operating agreement to establish the ambiguity? You do. And, well, you don't have to go there to establish it, because that would be improper, Your Honor. That's right. So you're saying by virtue of reading it out, you would say, well, it's ambiguous. It would be ambiguous. Then you look at Parole 11. And now you can look at Parole 11. So that's what's appropriate. That's your position. Our position is just looking at the document, looking in Section 6.5 where it says banks and lending institutions. In 7.5 it says capital L lenders. They're different. Okay. And if you read it the way the district court did, you read it out of the document. All right. We'll have you back on rebuttal. Thank you, Your Honor. Mr. Lichtenstein. Thank you, Your Honor. May it please the Court, my name is Michael Lichtenstein, and Your Honor, with me is Cheryl Axelrod, my co-counsel. We represent Eagle Bank in these proceedings. Your Honor, Eagle Bank lent Virginia Investment Partnership $3,250,000 in April 2013, which was secured by a lien on substantially all of the assets. And the lien was perfected by a UCC-1 financing statement that was filed the same day. Approximately five months later, an appellant asserts that he lent $505,000 and also secured it with a UCC lien that was filed on September 16, 2013. We're well aware of the facts. Why is this 7.5, why is it not ambiguous? Is not Mr. Ciardi correct that if you say lenders means anybody who loans money, you have read the provision, made it surplusage, if you will? Your Honor, I would respectfully disagree with Mr. Ciardi's position, and for this reason. First of all, 6.5 very clearly states that for authority over $2 million, you need a majority of the members, of the managing members, which was obtained here. Four out of seven members were obtained. 6.5 talks about borrowers. It doesn't say a majority. It says you need a vote. And did all the members vote? Four out of the seven voted, Your Honor. You have to refer back to 6.1, which says that the members voting is a majority, and four out of seven voted. Don't all the members have to have been consulted on it? I don't believe that that's what the agreement says, Your Honor. I believe that only four out of seven are sufficient or more. But, Your Honor, the difference between 6.5 and 7.5 is that 6.5 talks about borrowing money from banks that are secured by the assets of the entity, and 7.5 discusses borrowing money and talks about refinancing and restructuring debt. And so I believe the distinction there, although I didn't draft this agreement and it should not be held against Eagle Bank, which did its due diligence. First of all, it talks about different issues. And second of all, Your Honor, and I think this is a very important point, the defined term lenders, which Mr. Ciardi and Appellant refers back to in the 2010 operating agreement, which forms the basis of their entire argument that it includes other people other than Eagle Lender, is not an operating agreement that was ever entered into. If the court looks at the 2011 agreement, it references that there's a draft, that the 2010 agreement was drafted, but it was never signed. Does your brief state that? Our brief does not state that, Your Honor. But if the court looks at the record, the court will note that the 2010 agreement is not effective. We don't have anything before us that would, anything of record that indicates it was never signed. So I don't think we can, you know, the fact that maybe what the copy that we have doesn't have a signature, there's been no dispute about the fact that it was an agreement up until this moment. Your Honor, the fact that the only agreement in the record that is referenced is the 2010 draft agreement, Mr. Ciardi himself, the Appellant, never makes the argument that that was an executed agreement. Well, you never indicated that it wasn't. Well, Your Honor, we didn't indicate it wasn't. You might be creating an ambiguity here that you don't really want to, but... No, Your Honor, if I may respectfully, I disagree. I don't think I'm creating ambiguity. All I'm stating is that we think that the 2011 agreement is clear. It's unambiguous, as the judge below found. We don't even think you need to get to 7.5. It may not be in front of us, but when you were in front of Judge Diamond, did you assert the fact that the 2010 agreement was only a draft and it had not been signed? We did not assert that, Your Honor, because we believe, as Judge Diamond found, that the language in the 2011 agreement, which is the current operating agreement, is unambiguous, and so we didn't get into that argument or discussion about whether it was... It reads it out of the document, does it not? How does it make any sense? Well, Your Honor, I think it makes sense the way I explained before, tried to explain with respect to 6.5, which talks about borrowing money from lenders. It would seem to me that if you want to borrow money from lenders, you need to have four or five out of the managing members in 6.5 sign off as they did the corporate resolution in this case. In 7.5, if you're going to be involved in restructuring or refinancing, then for some reason known only to VIP and the drafters of the VIP agreement, you would need the majority of the managing members. Well, aren't both lenders? If someone's buying more equity in the company, they're lending money to the company. Your Honor, I don't think if they're buying equity in the company, which is what I believe these partners were doing, they're lending money to the company. It's a capital investment. It's an equity investment. But they are, in a sense of the word, lenders, and the district court would not consider that parole evidence or whatever you want to refer to it as. But you don't think there's an ambiguity if you open it up to other evidence beyond the actual document that said the… No, Your Honor, I don't think there's an ambiguity. I think it's clear that lenders, as the court found below, refers to all lenders, including Eagle Bank. I don't think there's any dispute or anybody would argue, as Your Honor yourself mentioned earlier, that Eagle Bank, as a bank, is a lender, and that that's not the issue. The real issue here, Your Honors, is that there are two bases for which Eagle Bank should receive the relief to which it's entitled. Number one, there was actual authority as evidenced by the record here, and as Your Honors pointed out, the record includes also arguments about apparent authority, and there is sufficient evidence, in fact, extensive evidence, about apparent authority in this case and ratification by the borrower. As you pointed out, Judge Collin, there is extensive evidence here that nobody raised this issue, and nobody includes the borrower. But getting down to that, the entire discussion we have with Your Honors here concerning whether or not there is such a thing as their right as a junior lien holder to attack the senior lien by reason of a lender, in the court below, this was really not something raised by you, that there's no such thing as a cause of action, that they're pushing here, and that if there is some standing for this person, either Article III or maybe provincial standing, this was something that wasn't raised by you or argued on your behalf. You focused strictly on the issue whether there was an ambiguity. Your Honor, as Mr. Ciotti pointed out, the court below granted the motion to intervene within a day or two after it was filed and before we even had a chance to file a response to it. Did you ask for reconsideration of that order? We did not ask for reconsideration of that order, but we did point out to the judge below that we didn't believe that they were even a secured lender and filed some pleadings on that issue. But with respect to the standing issue, and the court has raised it, Your Honor has given the appellant an opportunity more than once to provide the court with any controlling authority. And as Judge Rendell pointed out, the facts in those cases, in the Fox Hill case and in the Bristol County case, neither of them are their junior lender. In fact, the Bristol County case, the Virginia Circuit Court unreported decision case, didn't really even involve an invalidation of a lien. It's true that the appellant didn't give us any authority, which shows that they have the right to do what they did, because the cases were not exactly on point. But when it came to your turn, you didn't exactly furnish us any with cases that said that what the appellant is trying to do here is a cause of action unknown to the law, namely second to some third person's rights and attack a senior lien. Well, Your Honor, what we did address... What you did is you distinguished the three cases that they cited, but you didn't say anything to show that you had an absolute right here, and that they're, as I mentioned before, officious interlopers by trying to recognize the law was infirm. Well, Your Honor, with all due respect, I believe that the purpose of our response was to respond to their allegations that they had sufficient controlling authority. That's what the court requested in its letter. And our response was demonstrating to the court that not only is there no controlling authority, but that in actual fact the cases they cited don't stand for the proposition for which they were cited. And you were unable to find any cases that stood for the opposite, correct? That is, I didn't even respond. I didn't really focus on that issue, Your Honor, because I thought it was sufficient in light of the court's question, which demonstrated there is no controlling authority for them to step in and start making this argument. Let me ask you this. What's the significance of the Farron affidavit? Your Honor, I don't believe there's any significance to the Farron affidavit. I believe it's on some level a self-serving affidavit. His interpretation of what went on and didn't go on is really irrelevant to the issue here. Was his deposition taken? Well, no. In this case, Your Honor, there's really been no depositions taken in this case. Okay. And he's not involved in this case. Eagle Bank has a separate proceeding against them, but that's not relevant to this case. Your Honor, I don't think this court needs to look outside. It's clear under Virginia law that you look at the four corners of a contract when it's unambiguous. And when the court looks at the contract and sees that the VIP had actual authority to enter into this. Let me ask this, though. If you needed majority approval for the loan, and the document that's part of the record shows that four of the board members signed that resolution, and Farron, now by affidavit, said this loan was not authorized, doesn't that bring into question whether or not the loan was authorized? No, Your Honor. I don't believe so. I don't believe that Farron's opinion, after the fact, two or three years after the fact, after they borrowed the money, after they've used all the money, bears any relevance to this case at all. The issue before this court is that Eagle Bank, as a lender, engaged in its due diligence, which evidence demonstrates that it did, and obtained a corporate resolution, which, by the way, I'm not sure Van Hokey did. But the issue here is Eagle Bank obtained a corporate resolution. It obtained a letter of counsel. So you're relying on apparent authority? No, Your Honor. I'm sorry. If I'm saying that, I certainly didn't mean to say that. I'm relying on actual authority because the actual authority is granted in 6.5 of the operating agreement, and they followed those procedures. In addition to that, Your Honor, as we've argued in our brief, there was also clearly not only apparent authority but ratification. And when Mr. Ciardi suggested that maybe some of the money was used for the borrower, I believe the record shows unequivocally that all of the money was used for the borrower. We've cited in the record two instances where they received checks, the money went into their account. Unlike the Fox Hill case where the money went into the general partner's account, there's no question, and as Judge Cowan noted, nobody questioned us because VIP received $3,250,000 and used that money. And so even if this court were to find that there was an actual authority, there clearly was apparent authority. Why wasn't the vote of the members required? Why was the vote of the members not required? Your Honor, the vote of the members was not required because 7.5 is not required if you comply with 6.5. They complied with 6.5, which refers to the vote of the managing members, and once that was obtained, that was sufficient to demonstrate that there had been a corporate resolution authorizing the $3,250,000 loan. All right, I'm losing, you're losing me. Why wasn't 7.5 required? Your Honor, I don't believe the operating agreement requires that you comply with both 6.5 and 7.5. Why not? Well, I don't think there's anything in the agreement that says that, Your Honor. I think the agreement says that in 6.5, it says that to borrow money for the company from banks, if it's in excess of $2 million, then you need to have the approval of the Board of Managers. Okay, and then 7.5 says, without first obtaining the written consent of a majority in interest of the members, no officer may incur any debt or restructure or refinance any debt in the amount of $2 million or more, with the exception of financing to be obtained from lenders. Right, and Your Honor, there's two points there. One is, as I said before, I believe that this refers to restructuring, refinancing. It says incur any debt or restructure or refinance. And it also says, with the exception of the financing to be obtained by lenders. Okay, well, then that's putting the rabbit in the hat, if you will. So Eagle Bank is a lender, as the Court found below, and therefore you don't need to... But if we disagree with that and find at least it's ambiguous, then you would agree, would you not, that a vote of the members may have been necessary? If the Court disagrees that Eagle Bank is accepted from that provision, then yes, Your Honor. I would agree that, for purposes of actual authority, that a vote of the members is necessary. Let's assume that that's where we ended up. Where does that leave your lien on the money that was secured, the $1.2 million? Well, Your Honor, I believe Eagle Bank would still have a properly perfected lien for two reasons. One, as I've noted, there's apparent authority, and so there's still no basis to invalidate its lien. And number two, there are no cases that have been cited that even if appellant were correct in all of these arguments, that there would be any basis to argue that once Eagle Bank has lent $3,250,000, has a properly filed, perfected UCC1 lien, that a junior lien holder could come along and could invalidate the lien. So I believe it would leave in the same place. My time is up, I see, Your Honor. Okay. Basically, you're saying that they don't have any cause of action to challenge your lien. That is correct, Your Honor. I don't believe they have a remedy. Even if your loan was defective in some way? If our loan was defective in some way in terms of approval and we filed a properly filed UCC1 lien, I don't believe they have that remedy. Yes, Your Honor. All right. Okay. Thank you, Mr. Lichtenstein. Mr. Ciardi? Why don't you comment on that last point, Mr. Ciardi? Your Honor, the Fox Hill case, and I refer back to that again, even though it is not controlling. I understand. The Eighth Circuit there approved what the Bankruptcy Court did, which was basically say, I'm invalidating the lien. What it allowed, and the second part of it, which we don't really discuss here, is the bank in that case said, even if you disallow us, you've got to subordinate the other lien that the insider has to my lien, because I put money in and they're an insider. And the Bankruptcy Court, which was affirmed on appeal, said, no. You don't have a lien, you don't have a loan, you're out. And how does Eagle Bank become an insider? No, no, no, Your Honor. The lien of the insider was actually elevated over the mercantile bank claim in the Fox Hill case. They don't become an insider. Are you aware of the case, Elbar Investments v. Wilkinson, which held a subsequent purchaser or junior lien holder may collaterally attack a sale only if it's entirely void. A party having no privity with a mortgager may not complain of irregularities that would render the sale merely voidable. I'm not aware of that decision, Your Honor. And what's wrong with that law, if you're not aware? What's wrong with that as a statement of law? What I think it, as a statement of law, where I would have a problem with it, is that you have competing lenders here. You have competing lien holders that both are claiming the same asset. My client has a real standing, not issue in a bad way, but a real problem in that it will lose its rights to the asset if Eagle Bank gets the asset. And if my client did everything right, why should it not be able to say that Eagle Bank did everything wrong? Because there's law that says the fact that an agent has exceeded his or her authority is ordinarily a defense personal to the principal. What right do you have to exercise? Let's say that the lender did something wrong. What in the law gives you the right to step into the lender's, the borrower's, shoes and assert that right, when they themselves never filed anything to assert that right or recognize it? Your Honor, this is a completely ultra-virous act. If you look at Section 6.5... What's ultra-virus? It means it's completely outside of the authority of this entity. You're arguing that the loan made was void. Void. Under what provision? If you look at Section 6.5, and this is not cited by the appellate and not addressed by the court, it starts out, without limiting the generality of Section 6.1, but subject to the direction and oversight of the managing member, chairman of the board of managers, and the consent of the members if required by this operating agreement. They didn't get the consent of the members. If you go to Section 6.6, notwithstanding anything to the contrary you're in, the powers of the officer shall be limited as provided in Article 6 and Article 7. Well, we're assuming that the loan was improper in that regard. But they got the money, they used the money, that doesn't make the loan void. An Eagle Bank has a properly filed security interest. How does that avoid loan when they got the money, they used it, they never complained? How does it make the loan... When you speak about avoid loan, you're thinking about something that's contrary to the public interest or a fraud or something, but you don't have that here. You don't have... You have a loan that maybe, you're arguing, shouldn't have been made because it didn't have the consent of the members. And the borrowers are not Farron and Stokes. The borrower is the entity. The entity can only speak through the officers, which are only given the authority in this document, which is limited. And it's limited in the way that I have laid out here. And you can't shoehorn in a parent authority when right in your face is, you got to get the approval of the members. Assuming we don't buy your position, it's a void loan, void ambitio. Assume we say that at most it could be, on your argument, a voidable loan. How does that give you the authority to question as a junior lead holder and use that right that the borrower had to question the loan? Where in the law gives you that right to exercise the borrower's authority to question that loan? It was never assigned to you. It was never assigned to us. So where do you come to exercise a third party's right to void a loan, which they themselves never voided, never tried to, and indeed recognized? Right to the bitter end. Where I go with that, Your Honor, is the theory that, and again, we're not into bankruptcy, but I'm going to draw an analogy, is the trustee gets what's called hypothetical lien creditor rights. Meaning there's another lien creditor out there that's coming in to challenge these other lien priorities. You're not in a bankruptcy procedure. We're not in a bankruptcy. We don't have third party. There's no trustee here that has super rights here. No, but the trustee is given the rights of the hypothetical lien creditor. I am the actual lien creditor that is coming in to say, you didn't get what you needed. You don't get your lien. Okay. All right, Mr. Ciardi. Thank you. We understand your position. Thank you. And we thank both counsel for their arguments in this regard. And we'll take the matter under advisement. Thank you.